Edward Lee SMITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–00–193–CR.

Court of Appeals of Texas,
Waco.

Dec. 5, 2001.

Rehearing Overruled Dec. 28, 2001.

W.V. Dunnam, Dunnam & Dunnam, L.L.P., Waco, for appellant.

John W. Segrest, McLennan County District Attorney, James Wiley, McLennan County Assistant District Attorney, Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

VANCE, Justice.

Edward Lee Smith (Smith) was convicted of the felony offense of driving while intoxicated (DWI). The trial court sentenced Smith to ten years in prison and a fine of ten-thousand dollars. Smith brings this appeal citing twenty instances of error. We will affirm.

## FACTS

On the morning of January 9, 2000, Smith finished a night-shift at work and drove to a local fast-food restaurant for breakfast. He used the restaurant's drive-through to place his order. While Smith waited for his food, restaurant employees told Officer Joe Neal of the Waco Police Department, who was inside the restaurant at the time, that Smith smelled of alcohol and that he was drinking a can of beer. Neal went outside and motioned for Smith to park in the restaurant's parking lot. Neal saw cans of beer inside Smith's vehicle. Neal also observed that Smith smelled of alcohol and that his eyes were blood-shot. The officer then asked Smith to perform standardized field-sobriety tests. After Smith failed all three tests, Neal placed him under arrest for DWI. Neal transported Smith to jail. At the jail, Smith chose to take a breathalyzer test which would measure his breath-alcohol concentration. Smith's test results yielded two measurements that exceeded the legal limit of 0.08, the first result was 0.082 and the second was 0.086.

Smith was indicted by a grand jury for the offense of felony DWI. TEX. PEN.CODE ANN. § 49.09(b) (Vernon Supp.2001). He pled not guilty to the charge. After a trial, a jury found Smith guilty and assessed a sentence of ten years in prison and a ten-thousand-dollar fine.

## DISCUSSION

Smith alleges twenty points of error.

*Verdict*

In points one, two, three, and four, Smith contends that the jury's verdict does not support a conviction for felony DWI. According to Smith, the verdict supports only a conviction for misdemeanor DWI. The following is the relevant excerpt from the trial court's guilt/innocence charge:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 9th day of January, 2000, in McLennan County, Texas, the defendant, Edward Lee Smith did then or there drive or operate a motor vehicle in

a public place while the said defendant was intoxicated by not having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body, or by having an alcohol concentration of at least 0.08 and if you further find from the evidence beyond a reasonable doubt that the defendant previously thereto had been at least twice convicted of the offense of being intoxicated while operating a motor vehicle in a public place, to wit:

(1) on the 8th day of October, 1992, in the County Court at Law of McLennan County, Texas, in Cause Number 922116CR2 the said Edward Lee Smith, under the name of Edward Lee Smith,

(2) on the 19th day of September, 1985, in the County Court at Law of McLennan County, Texas, in Cause Number 851171CR1, the said Edward Lee Smith, under the name of Edward Lee Smith, and

And that the two convictions became final prior to the commission of the primary offense of Driving While Intoxicated alleged to have been committed on or about the 9th day of January, 2000, if it was committed, as alleged in the indictment, then you will find the defendant guilty of the felony offense of Driving While Intoxicated as alleged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of the felony offense of Driving While Intoxicated as alleged in the indictment.

Accompanying the court's charge was the following verdict form:

We, the jury, find the defendant, Edward Lee Smith, guilty of the offense of Driving While Intoxicated, as alleged in the indictment. . . .

We, the jury, find the defendant, Edward Lee Smith, not guilty. . . .

Smith's defense counsel objected to the failure of the court to modify the verdict form so that it required the jury to explicitly state that it found Smith had been twice convicted of DWI. The trial court overruled the objection and submitted the verdict form as it is written above. Using the verdict form provided, the jury found Smith guilty.

Smith's argument on appeal is that the jury should have been required to find by special issue that he had twice been convicted of DWI. Accordingly, he says the jury's verdict was insufficient to convict him of felony DWI. We disagree.

 Under section 49.04 of the Penal Code, driving while intoxicated is a Class B misdemeanor. Tex. Pen.Code Ann. § 49.04(b) (Vernon Supp.2001). If it is shown at trial that the defendant has been convicted of two prior DWI offenses, the offense is elevated to a third degree felony. *Id.* § 49.09(b).[1]

 The prior convictions are elements of the felony DWI offense. *Gibson v. State*, 995 S.W.2d 693, 696 (Tex.Crim.App. 1999). In *Tamez v. State*, the Court of Criminal Appeals held that in cases when the defendant agrees to stipulate to the two previous DWI convictions, the State can read the indictment at the beginning of the trial, including mention of the two jurisdictional prior convictions, but is foreclosed from presenting specific evidence of

1. When prior convictions are used to elevate a misdemeanor DWI to a felony, they must be alleged in the indictment for the district court to gain jurisdiction. *Tamez v. State*, 11 S.W.3d 198, 201 (Tex.Crim.App.2000). The State did allege Smith's prior convictions in the indictment.

the nature of the convictions during its case-in-chief. 11 S.W.3d 198, 202 (Tex. Crim.App.2000). The fact of convictions is admitted into evidence by stipulation as part of the State's proof during the guilt-innocence stage of the trial. *Gibson*, 995 S.W.2d at 696. Smith stipulated that he had previously been convicted as alleged in the indictment, and the stipulation was admitted into evidence as State's Exhibit 1.

In its decisions in *Tamez* and *Gibson*, the Court does not state there is a requirement that the jury in a felony DWI case be given a special issue on whether or not the defendant has been convicted twice before of DWI. The elements can be stated in the body of the court's charge and the jury instructed to find that those elements exist before finding the defendant guilty of the felony. If the jury finds the defendant guilty, it presumably has found that all the elements of the offense have been proven.

Smith relies on an intermediate appellate court decision that does not support his argument. In *State v. Mewbourn*, the Tyler court of appeals stated that "the prior convictions must be included in the jury charge and found to be true before a jury may find a defendant guilty of the offense of felony DWI." 993 S.W.2d 771, 773 (Tex.App.—Tyler 1999, no pet.). The Tyler court did not state that the jury must find by special issue that the prior convictions existed. The court was stating only that the jury must find the prior-offense elements of the felony DWI offense to be true before it can find the defendant guilty.

Points one, two, three, and four are overruled.

*State's Comments During Closing Argument*

In Smith's fifth, sixth, and seventh points of error, he complains that during closing argument, the State made two

statements regarding his failure to testify. After each statement, defense counsel made a motion for mistrial and also requested that the court instruct the jury to disregard the State's comments. The court overruled the requests and denied the motions.

Smith argues that the State's comments were "manifestly intended" to call attention to the jury of his failure to testify and thus violated his state and federal constitutional rights as well as article 38.08 of the Code of Criminal Procedure. The State argues that the statements were not a comment on Smith's failure to testify, but a comment on Smith's failure to produce non-testimonial evidence that Smith's defense counsel promised in opening argument to bring forth during trial.

Defense counsel, in his opening statement as to what he expected to prove, stated that he would show the jury Smith's badly injured leg, which he said affected Smith's ability to stand on one leg, one of the field-sobriety tests. During the trial, however, defense counsel elicited testimony from Smith's wife to prove the condition of her husband's leg. Counsel chose not to elicit testimony from Smith regarding his injured leg, and the leg was never displayed to the jury. In the State's closing argument, the following statements were made:

> Prosecutor: The defense would have you believe that he didn't do well on the one leg stand test because he has his injured leg. Ladies and gentlemen, during the defense's opening statement he promised you that he would bring the defendant over here and show his leg, but he didn't do it.
>
> . . .
>
> Prosecutor: Yet the defendant didn't follow through on this promise. They didn't show the defendant's leg or bring

forward any medical testimony about his leg other than what his wife said, who wasn't even sure when the accident happened.

The issue is: did the statements made by the State constitute a comment on Smith's failure to testify and thus violate his constitutional and statutory rights?

■ A comment on an accused's failure to testify violates the accused's state and federal constitutional privileges against self-incrimination. *Montoya v. State*, 744 S.W.2d 15, 34 (Tex.Crim.App.1987) (op. on reh'g); *Chimney v. State*, 6 S.W.3d 681, 702 (Tex.App.—Waco 1999, no pet.). In addition, the Code of Criminal Procedure provides as follows:

> Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.

Tex.Code Crim. Proc. Ann. art. 38.08 (Vernon 1979).

■ To violate the right against self-incrimination or article 38.08, the language, when viewed from the jury's standpoint, must be manifestly intended or of such a character that the jury would necessarily and naturally take it as a comment on the accused's failure to testify. *Caldwell v. State*, 818 S.W.2d 790, 800 (Tex. Crim.App.1991). To be offensive, the language must be more than an implied or indirect allusion to the failure of the accused to testify. *Swallow v. State*, 829 S.W.2d 223, 225 (Tex.Crim.App.1992); *Williams v. State*, 946 S.W.2d 886, 903 (Tex.App.—Waco 1997, no pet.). Moreover, if the language used can be reasonably construed as referring to the defendant's failure to produce evidence other than his own testimony, it is not an improper remark. *Banks v. State*, 643 S.W.2d 129, 135 (Tex.Crim.App.1982) (en banc); *Saldivar v. State*, 980 S.W.2d 475, 501–02 (Tex.App.—Houston [14th Dist.] 1998, pet. ref'd); *Cooper v. State*, 959 S.W.2d 682, 686 (Tex.App.—Austin 1997, pet ref'd).

■ We cannot say from the jury's standpoint that the State's remarks were a direct reference to Smith's failure to testify. The remarks were a critique of the amount of evidence Smith had put forth on his theory that the reason he failed the one-leg stand test was because his leg had been severely injured in a motorcycle accident. Defense counsel stated in his opening statement:

> [O]ne of his legs, his left leg is debilitated. Difficult for him to stand on it for any period of time. We are not just going to talk about it, ladies and gentlemen. We are going to pull his britches leg up and his boot down and show you that injured leg that this man suffered from.

Defense counsel was clearly referring to non-testimonial evidence of the defendant's badly injured leg. Thus, when the State commented on Smith's failure to introduce this non-testimonial evidence of the injury, it was an attempt to undermine the defense theory that the reason Smith failed the one-leg stand test was because of the injury.

We conclude that the State's remarks were not an allusion to Smith's failure to testify. Smith's fifth, sixth, and seventh points are overruled.

*Evidentiary Rulings*

Smith's eighth point of error complains of the trial court's sustaining the State's objection to the testimony of Dr. James Booker. His ninth point of error complains of the court's sustaining the State's objection to the testimony of Felipe Reyna.

During its case-in-chief, the State presented testimony from the arresting officer, Officer Joe Neal of the Waco Police Department. On direct examination, Officer Neal testified that he had been employed as a police officer for twelve years. Officer Neal also testified as follows:

Prosecutor: ... [I]n your training and experience with the Waco Police Department, have you had an occasion to stop people on few or many occasions to determine whether or not they are intoxicated or impaired?

Officer Neal: I have made several hundred DWI arrests. I've stopped hundreds and hundreds more people or dealt with them for different reasons and administered the test. Probably well over a thousand people I've dealt with in the course of my career that I have had to administer at the time, whether they were drunk in public or to determine if they were intoxicated due to an offense they committed. And I have administered the test well over a thousand, maybe two thousand times.

Prosecutor: Each time that you had administered the test did those result in arrests?

Officer Neal: No, they didn't.

Smith called Dr. James Booker during the presentation of his defense in an attempt to elicit testimony concerning the number of DWI arrests made in 1996 in McLennan County. The State objected to this testimony on the ground that it was not relevant, and the court sustained the objection.

■ When admitting or excluding evidence, the trial court is allowed to use its discretion. *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex.Crim.App.1990); *Burks v. State*, 40 S.W.3d 698, 700 (Tex. App.—Waco 2001, no pet. h.). As an appellate court, we should not set aside the trial court's ruling unless the record shows that the trial court abused its discretion. *Id.* The trial court does not abuse its discretion in the admission or exclusion of evidence so long as the court's ruling falls within the "zone of reasonable disagreement." *Castaldo v. State*, 32 S.W.3d 413, 422 (Tex.App.—Waco 2000, pet. granted).

■ Dr. Booker testified outside the jury's presence that in 1996 there were approximately 400 DWI arrests made in McLennan County. Dr. Booker had researched this statistic when he worked on a political campaign. On appeal, Smith argues that his expert's testimony was necessary to rebut Officer Neal's testimony in which he claimed to have given up to 2,000 field sobriety tests to suspects during his career. Smith wanted to show that Officer Neal was exaggerating about his experience.

Rule 402 states:

All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible.

TEX.R. EVID. 402. At trial, the State argued that the testimony in question was not relevant because Dr. Booker was citing a statistic that was four years old. Also, Dr. Booker only offered a statistic of the number of DWI arrests for a period of one year, whereas Officer Neal had testified that he had performed sobriety tests on individuals suspected not only of DWI, but public intoxication and other related offenses as well, and over a period of several years. Accordingly, we cannot say that the trial court abused its discretion in sustaining the State's relevancy objection to Dr. Booker's testimony. We overrule the eighth point of error.

Smith attempted to offer Felipe Reyna's expert opinion that a DWI suspect's

breath-alcohol concentration can vary by as much as 0.01 when the sample is taken by the model 5000 intoxilyzer machine which is used by the Waco Police Department to measure a suspect's breath-alcohol concentration. The State objected to the questioning on the grounds that Reyna was not a qualified expert on the intoxilyzer and that such testimony was irrelevant. The trial court sustained the objection, and Smith's ninth point attacks that ruling.

 The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex.Crim.App.2000). Absent an abuse of discretion, the trial court's decision to admit or exclude testimony will not be disturbed. *Id.* The party proffering the expert witness bears the burden of showing that the witness is qualified on the specific matter in question. *Id.* Moreover, Rule 702 of the Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702.

 Outside the jury's presence, Reyna testified that he had seventeen years of experience in the general practice of criminal defense, and that he had also served as district attorney of McLennan County. Reyna further stated that he had "seen and studied" the model 5000 intoxilyzer machine "when they started doing the two readings within a few minutes of each other." Reyna also stated that he had witnessed on many occasions that the intoxilyzer machine gave two measurements of

an individual's breath-alcohol concentration which varied to the extent of 0.01.

Smith had the burden of proving that Reyna was a qualified expert on the intoxilyzer machine. The only evidence of Reyna's qualifications was the fact that he had seen the intoxilyzer machine in use, and had witnessed its measurements of the breath-alcohol concentration of his clients and other unknown individuals. Smith did not offer evidence of Reyna's special knowledge of how the intoxilyzer works. Neither did Smith demonstrate that Reyna was educated in a field of science or math such that he could assist the trier of fact to understand why there would be a variance in the intoxilyzer's measurements. Also, Reyna was not shown to be trained or certified in evaluating an individual's performance on the intoxilyzer. Thus, we cannot say that the trial court abused its discretion in excluding Reyna's testimony. Smith's ninth point of error is overruled.

*Punishment Charge*

By his tenth point of error, Smith complains of the trial court's failure to instruct the jury at the punishment phase that no adverse inference should be taken from his failure to testify at the guilt-innocence phase.

Smith relies on *Brown v. State*. The rule from *Brown* is that the trial court commits error by refusing to charge the jury about the defendant's failure to testify at the punishment stage of trial. 617 S.W.2d 234, 238 (Tex.Crim.App.1981). Although Smith testified at the punishment stage, he argues that the jury should have been instructed to not take into account Smith's failure to testify at the *guilt-innocence stage* of trial. We have found no authority for this proposition. Smith relies on the *Brown* decision for his argument, but as stated, *Brown* is not applicable to Smith's case. Thus, we overrule Smith's tenth point of error.

*Instruction on the Legality of the Evidence*

Smith's eleventh and twelfth points of error contend that he was entitled to a jury instruction under article 38.23(a), which reads:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Tex.Code Crim. Proc. Ann. art. 38.23(a) (Vernon Supp.2001). Smith requested an instruction under this article, but it was denied.

 Only when there is a fact issue regarding the manner in which the evidence was obtained does article 38.23 require the court to submit an instruction to the jury. *See Hardin v. State*, 951 S.W.2d 208, 210 (Tex.App.—Houston [14th Dist.] 1997, no pet.) (citing *Thomas v. State*, 723 S.W.2d 696, 707 (Tex.Crim.App.1986)). If the underlying facts are undisputed, no fact issue exists, and an instruction is not required. *Holmes v. State*, 962 S.W.2d 663, 673 (Tex.App.—Waco 1998, pet. ref'd, untimely filed) (citing *Bell v. State*, 938 S.W.2d 35, 48 (Tex.Crim.App.1996)).

 Smith argues that a jury instruction was necessary because the arresting officer did not observe any suspicious conduct before he made the decision to detain Smith in the parking lot, and the stop was illegal because there was no evidence of the credibility of the State's two witnesses who allegedly saw Smith drinking a beer in his car and then told the arresting officer of their observations. On cross-examination of the arresting officer, Officer Neal, the following colloquy occurred:

> Defense counsel: And your reason for stopping this man and his lawful movement is because two women told you they smelled some alcohol on his breath? Two women that you knew nothing about the history of them? That's right?
>
> Officer Neal: Actually, they said he was drinking beer in the vehicle while operating a vehicle, which is in itself is an offense, drinking while driving. And the other reason was because they felt he might be intoxicated because they smelled a real strong smell of alcohol coming from the vehicle and they thought from his appearance he was intoxicated.

 Although a police officer must have probable cause for a full custodial arrest, a mere stop of an individual for the purposes of investigation does not require such substantial justification. *Gajewski v. State*, 944 S.W.2d 450, 452 (Tex.App.—Houston [14th Dist.] 1997, no pet.) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968)). Because a temporary detention is considered a lesser intrusion than a custodial arrest, a police officer may stop an individual if he has specific articulable facts which, in light of his experience and general knowledge, lead to the reasonable conclusion that criminal activity is afoot and the person detained is connected with the activity. *Hoag v. State*, 728 S.W.2d 375, 380 (Tex.Crim.App.1987).

Dawn Lopez is one of the employees who told Neal of her observations. Lopez testified that when she took Smith's money to pay for his order, she smelled a strong

odor of beer coming from him. She further testified that she watched Smith take a drink from a can of beer. Diane Gibson, the other employee, testified that she too smelled an odor of beer coming from Smith when she walked by the drive-through window. Gibson also stated that she saw Smith drink from a can of beer. Both Lopez and Gibson informed Neal of their observations. Their testimony regarding their observations of Smith was not disputed at trial. In his defense, Smith did not bring forth any conflicting evidence to challenge the employees' observations.

We find there are no fact issues regarding the legality of the manner in which the evidence was obtained. Smith's eleventh and twelfth points of error are overruled.

*Prosecutor's Notes*

Smith's thirteenth point of error complains of the trial court's failure to order the prosecutor to produce notes of her interviews with Lopez and Gibson. Smith argues that the prosecutor's notes constitute witness-statements and therefore should have been produced. The State contends that the notes are not witnesses-statements subject to disclosure under Rule 615 of the Rules of Evidence. The trial court sealed the notes in the record for appellate review.

Rule 615 of the Rules of Evidence provides that once a witness has testified on direct examination, the party who did not call that witness is entitled to examine and use "any statement of the witness" that relates to the subject matter of the witness's testimony. Section (f) of Rule 615 provides the definition of "statement" for the purpose of this rule. A statement is defined as:

(1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness;

(2) a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof; or

(3) a statement, however taken or recorded, or a transcription thereof, made by the witness to a grand jury.

Tex.R. Evid. 615(f). Rule 615 codifies and expands the *Gaskin* rule. Under *Gaskin,* the State was required to produce a witness's written statement to the defense at the conclusion of the witness's direct testimony. *Gaskin v. State,* 172 Tex.Crim. 7, 9–10, 353 S.W.2d 467, 469–70 (1961) (op. on reh'g).

The notes in question were the prosecutor's brief summary of both Lopez's and Gibson's expected testimony. Neither witness signed or adopted the summary as their own. The notes are not a "substantially verbatim recital" of either witness's testimony. Finally, the notes are not a recording or transcription of either witness's testimony to a grand jury. We conclude that the prosecutor's notes did not constitute witness-statements under Rule 615(f), and the trial court did not err in denying Smith's request for their production.

Smith's thirteenth point of error is overruled.

*Neal's Testimony on the Standardized Field Sobriety Tests*

Smith's fourteenth, fifteenth, and sixteenth points of error argue that the trial court erred in permitting Officer Neal to testify on the reliability and accuracy of the standardized field-sobriety tests.

When the State began questioning Neal on the subject of the horizontal gaze nystagmus ("HGN") test,[2] Smith objected to

**2.** The Court of Criminal Appeals thoroughly explained the meaning of "horizontal gaze

that line of questioning on the ground that Neal was "not scientifically qualified, [and] has no qualifications whatsoever as an expert." Smith also requested that the trial court instruct the jury "not to consider any of his testimony as to the reliability of this gaze nystagmus test." The court overruled the objection and the request for an instruction. The trial court gave Smith a "running" objection to Neal's testimony regarding his expertise to testify on the accuracy of the HGN test.

The fourteenth point complains that the testimony "constituted a supposed scientific conclusion of the ultimate issue of the guilt of the defendant." Neal testified:

> There are a total of six clues.[3] And any four or more clues would indicate a high level of intoxication, over a 0.08. And there is an eighty-eight percent chance on this test alone, this one test with no other indicator, you don't smell alcohol or anything else, nothing else to indicate intoxication, by this one test there is an eighty-eight percent chance of that person is intoxicated on some kind of drugs or alcohol.

▮▮▮ In *Emerson v. State*, the Court of Criminal Appeals held that because of the scientific nature of the HGN test, a testifying officer must be qualified as an expert in both the administration and technique of the test. *Emerson v. State*, 880 S.W.2d 759, 769 (Tex.Crim.App.1994). To qualify as an expert on the administration of the HGN test, a police officer has to show only

that he has received "practitioner certification" by the State of Texas. *Id.* Neal testified that he received a certification to administer the standardized field sobriety tests, which includes the HGN test, through a program at Texas A & M University. It is unclear from Neal's testimony whether he received the "practitioner certification" that was discussed in *Emerson.*

▮▮▮ However, we follow our sister court in Fort Worth in holding that *Emerson* does not require that an expert must be certified by the State of Texas before his testimony on the subject of the HGN test will be admissible. *Kerr v. State*, 921 S.W.2d 498, 502 (Tex.App.—Fort Worth 1996, no pet.). In *Kerr*, the court held that the arresting officer qualified as an expert on the HGN test because he had completed extensive training, had experience in administering the test, and held certification from a training course approved by the National Highway Traffic Safety Administration (NHTSA). *Id.* Similarly, Neal testified that he had extensive training on the standardized field sobriety tests which began at the police academy and continued with additional course work taken later in his career; and he also received certification through a course at Texas A & M University.

We hold that the court did not abuse its discretion when it held that Neal was qualified as an expert to testify on the administration and technique of the HGN test.

---

nystagmus" and the testing procedures for measuring this condition in *Emerson v. State*, 880 S.W.2d 759, 765–67 (Tex.Crim.App. 1994). In short, the term refers to the inability of the eyes to smoothly follow an object moving horizontally across the field of vision, particularly when the object is held at an angle of 45 degrees or more to the side. *Id.* The consumption of alcoholic beverages has been shown to exacerbate this naturally-occurring condition. *Id.* at 766.

**3.** In conducting the HGN test, an officer looks for three so-called "clues" with each eye. *See Emerson*, 880 S.W.2d at 766. They are: (1) the eye cannot follow a moving object smoothly; (2) distinct nystagmus when the eye is at maximum deviation; and (3) an onset of nystagmus before the eye has moved 45 degrees to the side. *Id.*

The real issue, however, is whether Neal went beyond the proper scope of his expertise regarding the HGN test.

The Court in *Emerson* held that an officer may testify concerning a defendant's performance on the HGN test, but he may not correlate the defendant's performance on the test to a precise blood-alcohol content ("BAC"). *Emerson*, 880 S.W.2d at 769. Neal testified that Smith had exhibited the maximum six clues of the HGN test. The prosecutor then asked Neal how the clues are used to determine whether or not there is a probability that a suspect is intoxicated. Smith's counsel objected to this question on the ground that Neal was not qualified as an expert to respond to it.[4] Neal stated that a suspect who exhibits at least four clues would indicate a blood-alcohol content "over 0.08." The prosecutor essentially asked Neal to correlate Smith's performance on the HGN test to a conclusion that his blood-alcohol content exceeded the legal limit. Neal's response was an impermissible correlation of Smith's performance on the test to a BAC. *See Webster v. State*, 26 S.W.3d 717, 723 (Tex.App.—Waco 2000, pet. ref'd) (holding an officer's testimony similar to that of Neal's to be an impermissible attempt to estimate the defendant's BAC on the basis of his HGN test results).

 Non-constitutional errors must be disregarded unless they affect substantial rights. TEX.R.APP. P. 44.2(b). To ascertain whether or not "substantial rights" were affected, we must determine whether the court's error, in light of the entire record, "had more than a slight influence on the verdict." *Fowler v. State*, 958 S.W.2d 853, 866 (Tex.App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex.Crim.App.1999).

"If we have grave doubts about its effect on the outcome, we should find that the error was such as to require a new trial." *Id.* Under this analysis, neither party bears a burden of proof. *Id.; Raney v. State*, 958 S.W.2d 867, 874 (Tex.App.—Waco 1997), *pet. dism'd, improvidently granted*, 982 S.W.2d 429 (Tex.Crim.App. 1998).

Officer Neal tried to quantify Smith's BAC as "over 0.08" based on his performance on the HGN test. The jury was charged with determining whether Smith was intoxicated by the introduction of alcohol into his body and by having an "alcohol concentration" in excess of the legal limit of 0.08. Section 49.01 of the Penal Code defines "alcohol concentration" to be the number of grams of alcohol per: (1) 210 liters of breath; (2) 100 milliliters of blood; or (3) 67 milliliters of urine. TEX. PEN. CODE ANN. § 49.01 (Vernon Supp.2001). Smith took a breathalyzer test that measured his breath-alcohol concentration. His test results yielded two measurements that exceeded 0.08, the first result was 0.082 and the second was 0.086. Officer Neal testified that Smith smelled of alcohol, his eyes were blood-shot, and he failed field sobriety tests. Because this evidence was presented to the jury, we conclude that the court's error in admitting Neal's testimony on a precise BAC did not have more than a "slight" influence, if any, on the jury's verdict.

Finding harmless error, we overrule Smith's fourteenth point of error.

Smith's fifteenth point of error makes a similar complaint regarding Neal's testimony about Smith's performance on the one-leg stand test.[5] Neal testified that

---

4. "The party proffering the expert witness bears the burden of showing that the witness is qualified on the specific matter in ques-

tion." *Penry v. State*, 903 S.W.2d 715, 762 (Tex.Crim.App.1995).

5. Neal testified that the one-leg stand test is a standardized field sobriety test. He described

Smith exhibited three out of the four "clues"[6] in his performance on the test. The prosecutor asked Neal if he was "familiar with the percentage of accuracy on this test?" Smith objected to the question on the ground that Neal was "wholly unqualified to give any such conclusion." The trial court overruled the objection, and Neal testified:

> You are trying to guage a .08 percent blood alcohol content and the accuracy rate is eighty-three percent accurate if that person exhibits two or more of the four clues. So any person exhibits two or more of the indications, eighty-three percent, two or more, they would be intoxicated at a .08 or above. And, of course, we are trying to guage the alcohol content, but that also includes drugs or alcohol they would be intoxicated on drugs or alcohol eighty-three percent chance.

Thus, Neal correlated Smith's performance on the one-leg stand test to a precise BAC that exceeded the legal limit.

Smith's sixteenth point of error complains of Neal's testimony about Smith's performance on the walk-and-turn test.[7] Neal testified that Smith failed the walk-and-turn test by exhibiting four "clues."[8] The prosecutor asked Neal what "is the rate of accuracy on the walk and turn test?" Smith objected on the ground that Neal was "wholly unqualified to give any opinion about this." The trial court overruled the objection, and Neal testified:

> Again the rate of accuracy is if they fail two clues or more, the rate of accuracy is seventy-nine percent accurate. And that's they would be level .08 BAC or higher, if they fail any two clues of the eight clues. In this case, he failed four of them.

the test as follows: The suspect is told to stand with feet together, and hands held loosely to the side of the body. The suspect is then instructed to raise one foot approximately six inches off the ground. The suspect must hold the foot in that elevated position for ten seconds. The test consists of three ten-second trials.

6. Neal also testified to the following: Officers trained in the administration of the one-leg stand test are taught to look for four "clues," or indicators that suggest a suspect is intoxicated. One clue is that the suspect sways while trying to balance himself on one foot. A second clue is when the suspect raises his arms from his side in order to balance himself. A third clue is when the suspect "hops" on one foot. The fourth clue is when the suspect lowers the raised foot because he cannot maintain his balance.

7. Neal testified to the following: The walk-and-turn test is another standardized field sobriety test. During the first phase of the test the suspect is told to place one foot directly in front of the other and touch heel to toe. The suspect must remain in this position with his hands held loosely to his side while the officer explains the instructions. The sus-

pect is instructed to walk nine steps forward, touching heel to toe, in a straight line. The suspect must count to nine out loud corresponding to each step taken. At the end of the nine steps, the suspect must pivot taking a series of small steps to turn around. Next, the suspect walks back nine more steps in a straight line, with hands held loosely to the side and feet placed directly in front of each other, touching heel to toe.

8. According to Officer Neal's testimony, there are eight "clues," or indicators in the walk-and-turn test that suggest a suspect is intoxicated. The first two clues may occur in the instructional phase. One clue is when the suspect loses his balance while listening to the instructions. Another is when the suspect begins to perform the test before the officer has finished explaining the instructions. During the walking phase of the test there are six more clues: (1) if the suspect stops walking at any time; (2) if the suspect fails to touch their heel to toe; (3) if the suspect loses his balance and fails to maintain a straight line; (4) if the suspect uses his arms to help him keep his balance; (5) when the suspect spins to turn instead of taking small steps to pivot; and (6) if the suspect takes the incorrect number of steps.

Thus, Neal correlated Smith's performance on the walk-and-turn test to a precise BAC that exceeded the legal limit.

Regarding Neal's testimony on the one-leg stand test and the walk-and-turn test, Smith objected to its admission on the ground that Neal was not qualified as an expert to give his opinion on the accuracy of these tests. Our research did not reveal a case similar to *Emerson* in which it was held that correlation of a suspect's performance on one of *these tests* to a precise BAC is error.

The *Emerson* Court stated that in the late 1970s, researchers at the Southern California Research Institute developed a sobriety test battery consisting of three tests: the HGN, the walk-and-turn, and the one-leg stand. *Emerson*, 880 S.W.2d at 766. The Court also stated that the National Highway and Traffic Safety Administration (NHTSA) in its publication, *Improved Sobriety Testing*, 1 (1984), concluded that the HGN test is the "single, most effective field sobriety test in determining whether an individual is alcohol-impaired." *Id.* at 767. After consulting "literature concerning alcohol and its effects on eye movement, and considering case law from other jurisdictions addressing the reliability of the HGN test," the Court concluded that the scientific theory underlying the test was sufficiently reliable pursuant to then Rule of Criminal Evidence 702. *Id.* at 768.

But because the Court was unable to conclude that the HGN technique was a sufficiently reliable indicator of precise BAC, the Court was unwilling to allow an expert to correlate a suspect's performance on the test to a BAC level because the NHTSA's own study indicated a margin of error of .03 when its mathematical formula was used to determine BAC level based on the angle of onset of nystagmus. *Id.* at 769. The Court believed such mar-

gin of error was too high to allow estimations of a defendant's BAC based on his performance on the test to be admissible. *Id.* Moreover, the Court emphasized that the State has other means available to quantify a defendant's BAC which are much more effective, such as the blood, breathalyzer, and urine tests. *Id.*

The HGN test differs significantly from the walk-and-turn and one-leg stand tests. The NHTSA considers the HGN test to be the "most effective" field-sobriety test of the three-test battery. *Id.* at 767. The HGN test is based on scientific theory, while the latter tests are grounded in common knowledge that excessive alcohol consumption can cause coordination, balance, and mental agility problems. For example, the first part of the walk-and-turn test is called the "instructional stage" where the officer explains the instructions to the suspect while the suspect stands heel to toe with one foot in front of the other, hands by his side, and listens attentively. Also, in the one-leg stand test the suspect must count to ten while standing on one foot, while his other foot is raised six inches from the ground. The sole purpose of these tests is to reveal clues or symptoms of impairment. However, it is also common knowledge that these symptoms can be caused by a variety of physical and environmental conditions having nothing to do with intoxication.

Neal attempted to give these field sobriety tests the imprimatur of scientific accuracy when he correlated Smith's performance on the tests to a precise BAC. His characterization of the field sobriety tests was misleading in that the jury may have given the tests undue significance as scientific truths, when, in fact, they measure only gross impairment of a suspect's physical and mental faculties which may have a wide variety of causes. We conclude that the failure of a suspect to per-

form well on either of these tests, neither having been shown to have the reliability of the HGN test as stated in *Emerson*, is only evidence of impairment. Thus, we hold that a trial court commits error when it allows an expert on administering the tests, over objection, to correlate a suspect's performance on either the walk-and-turn test or the one-leg stand test to a BAC. As noted in *Emerson*, the State has other means available in quantifying a suspect's precise BAC, *i.e.*, blood, breathalyzer, and urine tests.

■ We find that the trial court erred in allowing Neal to correlate Smith's performance on both the walk-and-turn and the one-leg stand tests to a precise BAC. However, our analysis used to assess harm under Smith's fourteenth point of error is applicable here, and therefore, Smith's fifteenth and sixteenth points of error are also overruled.

*Voir Dire*

Smith's seventeenth, eighteenth, nineteenth, and twentieth points of error complain of responses by some venire persons that the trial court allowed other venire persons to hear despite his objections. Smith contends that the following responses made by prospective jurors during voir dire were highly prejudicial and in effect constituted "testimony" such that Smith was harmed because he could not cross-examine the venire persons at the time such responses were made: (1) six venire persons stated that they believed a person can have an alcohol concentration of less than 0.08 and still be intoxicated; (2) the entire panel agreed with that statement; (3) some venire persons stated what factors they believed indicated that a person was intoxicated; and (4) some venire persons stated that in their opinion the intoxilyzer, a machine that measures a person's breath-alcohol concentration, is reliable.

Smith's brief cites no authority for his argument. Smith argues that the trial court had an "affirmative duty" to "personally intervene and stop this gross and prejudicial abuse of the voir dire procedure." (APPELLANT'S BRIEF P. 38). Smith also argues that the fact that he cannot cross-examine a venire person after one of their responses "constitutes a violation of Defendant's 6th Amendment right of confrontation guaranteed him by the Due Process Clause of the Constitution of the United States in that, as a practical matter, his counsel cannot reasonably attack or impeach by cross-examination the opinions of the jurors who gave said testimony." *Id.*

■ The conduct of voir dire is within the sound discretion of the trial court. *Camacho v. State*, 864 S.W.2d 524, 531 (Tex.Crim.App.1993); *Tamez v. State*, 27 S.W.3d 668, 672 (Tex.App.—Waco 2000, pet. ref'd). Thus, the standard of review for Smith's complaints is an abuse of discretion standard. A voir dire question is proper if its purpose is to discover a juror's views on an issue applicable to the case. *McCarter v. State*, 837 S.W.2d 117, 121 (Tex.Crim.App.1992). Questions seeking to elicit bias or prejudice from prospective jurors are proper. *Maddux v. State*, 862 S.W.2d 590, 591–92 (Tex.Crim.App. 1993). Improper questions include those that ask potential jurors to reach conclusions based on "hypothetical facts" that mirror the case. *Id.*

One of the issues applicable to Smith's case was whether he was intoxicated. The law upon which the State is entitled to rely for a DWI conviction includes the definition of "intoxicated" found in section 49.01(2) of the Penal Code:

(2) "Intoxicated" means:

(A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled sub-

stance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or

(B) having an alcohol concentration of 0.08 or more.

Tex. Pen.Code Ann. § 49.01(2) (Vernon Supp.2001).

 We have examined the record of the voir dire proceedings. The State questioned the jurors at length on the issue of the definition of "intoxicated." The State asked some jurors to define the term themselves. The State also read the definition as stated in section 49.01 to the jurors. The jurors were asked to list the factors they believed indicated that a person is intoxicated. Finally, the State inquired about the jurors' personal experiences with an intoxilyzer, a machine that measures a person's breath-alcohol concentration. The State was attempting to elicit the jurors' views on an issue applicable to the prosecution of Smith for felony DWI. *McCarter*, 837 S.W.2d at 121. During this discussion, the State did not attempt to ask the jurors to reach conclusions on hypothetical facts similar to Smith's case. *Maddux*, 862 S.W.2d at 592.

We conclude that the trial court did not err in allowing other members of the venire to hear the responses to the State's questions regarding the definition of "intoxicated." Thus, Smith's seventeenth, eighteenth, nineteenth, and twentieth points of error are overruled.

## CONCLUSION

Having overruled all of Smith's points of error, we affirm the judgment.

Justice GRAY concurring.

GRAY, Justice, concurring.

The objection and brief on issues 14, 15, and 16 are that the officer did not have the expertise required under rules 701 and 702 to testify as to the percentage of accuracy of the three standardized field sobriety tests. To fully appreciate the very limited scope of Smith's issues on appeal we must start with Smith's brief. The entirety of Smith's brief on these three issues is as follows:

Over defense's proper objections that the evidence constituted conclusions of a witness not qualified to give expert opinion evidence thereon, the Trial Court permitted an ordinary *unranked* police officer, with no medical or even college training, to testify to the percentage of accuracy of the H.G.N. test (R.Vol.3, P. 52–74), the percentage of accuracy of the Walk and Turn Test (R. Vol.3, P. 73–74), and the percentage of accuracy of the One Leg Stand Test (R. Vol.3, P. 73–74). This was a direct violation of T.R.C.P. Rules 701 and 702. Such evidence constituted a supposed scientific conclusion of the ultimate issue of the guilt of the Defendant. Its prejudice can never be overstated.

The rule is well stated in 36 Tex. Jur.3d Evidence, § 544, p. 461 as follows:

"§ 544. In general, opinion rule

As a general rule, sometimes termed the "opinion rule," the testimony of a witness must be limited to the facts of which he has personal knowledge 11, and he must not give his individual opinion or conclusion, based on those facts 12. It is ordinarily for the jury to draw the proper deductions arising from his statement of the facts 13."

The internal numbers apparently refer to footnotes in the original text not included in the brief.

At trial, Smith did not attack the officer's expertise to administer the test. In response to Smith's argument to the trial court that Officer Neal was not qualified to

testify about the accuracy of the test the State argued that he was a certified field sobriety practitioner. Smith responded: "He might be qualified to say what he did, but he is not qualified to give conclusions as to the scientific basis and the reliability of it." Additionally, Smith's complaint is not directed at the correlation of the "angle of onset of nystagmus" (the point at which the eye begins to jerk) in conducting the HGN test to determine Smith's precise blood alcohol content (BAC). *See Emerson v. State* 880 S.W.2d 759, 769 (Tex. Crim.App.1994). The holding in *Emerson* is that a witness with a practitioner's certification cannot testify about a precise BAC based upon the angle of onset of nystagmus. In conducting the scientific test there was simply too great a margin of error to consider the results reliable as a means to determine the precise BAC. But that is not what the officer was asked. Smith does not allege an *Emerson* type violation at trial or on appeal. Accordingly, the discussion in the majority opinion regarding the propriety of correlating performance on the standardized field sobriety test to BAC is not before us.

The reliability as an indicator of intoxication of each of the standardized field sobriety tests at issue has been well documented. *Id.* The extensive scientific literature allowed the court in *Emerson* to conclude that the HGN test is a reliable scientific test as an indicator of intoxication by being impaired, but not of being intoxicated by having a BAC in excess of the maximum legal limit. The question presented to us, which *Emerson* did not address, is whether the certified practitioner can testify regarding the statistical accuracy of the field sobriety test as a reliable indicator of intoxication by being impaired, notwithstanding that Neal had not conducted any of the scientific studies which had validated the reliability of the test.

The questions and answers leading up to Neal's testimony about the percentage accuracy of the HGN test drew several objections. While there was an objection of a fourth amendment violation, most of the objections related to Neal's lack of qualifications as an expert to testify about the accuracy or reliability of the test. The portion of the record set forth below is the manner in which the percentage of accuracy of the HGN came into evidence:

Q. Okay. What is the decision point to determine whether or not there is a probability that the person is intoxicated?

A. There are six cues.

MR. DUNNAM: Can we have a running objection to all this pertaining to his expertise?

THE COURT: All right. Yes, sir.

A. There are total of six cues. And any four or more cues would indicate a high level of intoxication, over a .08. And there is an eighty-eight percent chance on this test alone, this one test with no other indicator, you don't smell alcohol or anything else, nothing else to indicate intoxication, by this one test there is an eighty-eight percent chance of that person is intoxicated on some kind of drugs or alcohol.

The request for a running objection relates to Smith's earlier objection regarding Neal's qualifications to testify regarding the reliability of the HGN test. Neal had testified that the HGN test had been "Tested nationwide and accepted nationwide before the courts." Smith made the following objection and motion which were overruled:

Object to this. Not qualified to give opinions whatsoever in any respect and prejudicial to the rights of the defendant. Move for the Court to instruct the jury not to consider any of his testi-

mony about the reliability of any such tests because he knows nothing about it in truth and in fact. He is not scientifically qualified, has no qualifications whatsoever as an expert. And we move the Court to instruct the jury not to consider any of his testimony as to the reliability of this gaze nystagmus test. He is not a scientist. He is not an expert whatsoever.

The dangers of running objections are well documented in the decisions of this State. But in view of the previous objections, including the one quoted above, the trial court was adequately apprized by the request for a running objection that the focus of the complaint was directed at Neal's testimony regarding the reliability of the HGN test as an indicator of intoxication. This fairly includes an objection to the percentage accuracy of the HGN test. Accordingly, Smith has adequately preserved this issue for our review.

To be useful to the jury, the officer must be able to testify that the presence of four or more clues on the HGN test indicates that the subject is intoxicated. If the officer could only testify that there were a certain number of clues present it would not assist the jury in determining the issue. Because it takes the presence of at least four clues on the HGN test to make a reliable determination of intoxication, testimony that a certain number of clues were present without also testifying that it takes at least four clues on the HGN test to indicate intoxication, could actually mislead the jury. For example, if only three factors were present in the HGN test, it is not a scientifically reliable indicator that the subject is intoxicated. But the jury may improperly consider the presence of three of six clues evidence of intoxication if the officer was prohibited from testifying that it takes the presence of at least four

clues before the HGN test is a reliable indicator of intoxication.

But there is a point beyond which a certified field sobriety practitioner may not testify. While the officer can testify that the presence of four clues on the HGN test is an indicator of intoxication, it does not mean that the officer can testify that based on the test results there is an 88% probability that the subject is intoxicated. The officer has not performed the reliability analysis, could not explain it, and thus cannot give an opinion about it. Thus the officer may testify based upon his expertise as a certified field sobriety practitioner that a certain number of clues is an indication of intoxication. But a certified field sobriety practitioner cannot testify as to the statistical reliability of the field sobriety test.

In this case, the question asked by the state was "What is the decision point to determine whether or not there is a probability that the person is intoxicated?" This question called for a simple numeric response—four. The officer's actual response included this answer but went on to opine that four or more clues indicated a BAC greater than .08 and that based on the test results it was 88% probable that Smith was intoxicated. The question did not call for improper expert testimony. To the extent that Neal's answer went beyond the question, it would have been preferable for Smith to interpose an objection that the answer was not responsive to the question and ask that the improper testimony be stricken. He did not. The running objection, however, was adequate to preserve the complaint about the officer's testimony regarding the percentage of accuracy of the HGN test. The trial court erred in not striking this improper portion of Neal's testimony.

In issue 15, Smith complains that testimony elicited about the accuracy of the

walk-and-turn test was improperly admitted. Unlike the question about the HGN test, the question on the walk-and-turn test did not ask about the number of clues required to indicate that the subject was intoxicated. The State asked Neal "What is the rate of accuracy on the walk and turn test?" Smith objected "I don't know if we have a bill on this or not. This man's wholly unqualified to give any opinion about this." The running objection was granted, and the objection was overruled. The trial court erred in overruling the objection. The question inquired about the statistical reliability of the walk-and-turn test. The officer was not qualified to give an opinion regarding the accuracy of the test. The officer's response was "Again that rate of accuracy is if they fail two cues or more, the rate of accuracy is seventy-nine percent accurate. And that's they would be level 0.08 BAC or higher, if they fail any two cues of the eight cues. In this case he failed four of them." In addition to the question calling for improper testimony regarding the reliability of the test, the response also included an effort to correlate test results with BAC. There was no objection to this non-responsive portion of the answer nor is there a complaint raised about this attempted correlation on appeal. The trial court erred in overruling the objection to Neal's testimony regarding the statistical reliability of the walk-and-turn test as an indicator of intoxication.

In issue 16, Smith complains that the trial court erred in admitting Neal's testimony about the accuracy of the one-leg-stand test over Smith's running objection that Neal was not qualified to give an expert opinion on the reliability of the test. Although Smith's brief cites only the admission of this testimony over the running objection, he had previously objected to the same testimony as follows:

Q. Are you familiar with the studies in regard to the one leg stand test?

A. Yes. This test, when tried to engage [trying to gauge] a point .08 level blood alcohol content, the test is eighty-three percent.

MR. DUNNAM: We object to this. Move the Court to strike it and the jury not consider one word of this testimony upon the grounds his conclusions of a witness who is wholly unqualified to give any such conclusion. And it is highly prejudicial to the rights of the defendant. Move the Court to strike it and order the jury not to consider it.

The objection was overruled and Smith was given a running objection. Neal then completed his answer as follows:

A. You are trying to gauge a .08 percent blood alcohol content and the accuracy rate is eighty-three percent accurate if that person exhibits two or more of the four cues. So any person exhibits two or more of the indications, eighty-three percent, two or more, they would be intoxicated at a .08 or above.

And, of course, we are trying to gauge the alcohol content, but that also includes drugs or alcohol they would be intoxicated on drugs or alcohol eighty-three percent chance.

As with the other test, the trial court erred in allowing Neal to testify regarding the statistical accuracy of the one-leg-stand test.

### CONCLUSION

I do not join the majority opinion to the extent it discusses other issues and purports to make holdings on issues not presented by the brief in issues 14, 15, and 16. As indicated above, the brief was very limited. Our opinion should likewise be limited. Accordingly, this concurring opinion addresses only those issues raised by the brief necessary to the disposition of

issues 14, 15, and 16. I join the remainder of the majority opinion, including the harm analysis on issues 14, 15, and 16.